## SHEALY v. UNITED STATES. SIBERT et al. v. SAME. WILKINSON v. SAME.

District Court, W. D. South Carolina. January 29, 1930.

Mays & Featherstone and Park & McDonald, all of Greenwood, S. C., for plaintiff Shealy.

Mays & Featherstone, of Greenwood, S. C., for plaintiff Sibert et al.

Mays & Featherstone, of Greenwood, S. C., and Hubert C. Cox, of Abbeville, S. C., for plaintiff Wilkinson.

Joseph A. Tolbert, U. S. Atty., of Greenville, S. C., T. J. Williamson, Senior Atty., U. S. Veterans' Bureau, of Washington, D. C., and J. C. Wilcox, Regional Atty., U. S. Veterans' Bureau, of Columbia, S. C.

WATKINS, District Judge. The above entitled actions were tried before me with juries at the November, 1929, term of court at Greenwood, S. C. In each case the plaintiffs claimed interest upon the principal amounts of the policies from the respective dates of total and permanent disability, and it was claimed that such disability in each case had resulted to the soldier at the date of his discharge. In the Wilkinson Case, however, a converted policy had been issued to the soldier at a later date and by agreement the complaint was amended and the action was based upon the converted policy; the allegation being that there was total and permanent disability from the date upon which such policy was issued, and it was agreed that the jury should fix the date from which such disability existed, and it did fix the date as the date of the issue of the converted policy. In each case it was further agreed that the form of the verdict should be, "We find for the plaintiff," or "We find for the defendant," leaving to the court the determination of whether interest should be allowed or not.

The sole issue, therefore, for my determination now is whether plaintiffs are entitled to an allowance of interest from the dates fixed by the juries, and, if so, at what rate. While I have carefully reviewed all the decisions pro and con cited by counsel and all other decisions of the courts upon this subject, I deem it unnecessary to review any of these cases in this opinion except the decisions of the Supreme Court which bear directly or indirectly upon the point. The lower courts have been in hopeless and irreconcilable conflict.

It is a general principle of law, established by an unbroken line of decisions, that a sovereignty cannot be sued except by its own consent expressed by legislative authority, and that the extent of a recovery under such authority is limited to what is provided by the express terms of the statute or necessary implications therefrom. While it is a general principle of commercial law that one who becomes indebted to another upon contract is liable for the payment of interest on the sum due from the date fixed for payment without any express provision therefor, it has nevertheless been held that this rule does not apply to obligations of the government; the reason being that it is assumed that a government, in dealing with its citizens, will pay its obligations at maturity, and the lawmakers will not reflect upon the government by assuming otherwise. It has, however, for many years been the practice of the sovereignties of this country, both state and federal, to borrow money from individuals and to provide for the repayment thereof by the issue of bonds providing for a stated rate of interest. Our Constitution provides that no person shall be deprived of life, liberty, or property without due process of law, and that private property shall not be taken for public use without just compensation.

In some of the earlier condemnation proceedings, where the property had been taken and used by the government for many years before compensation was made, no allowance was made because of the delay. Later on, however, in a spirit of fairness, the courts held that, where property was taken and used by the government, and the assessment of damages arrived at only after great delay, a fair rental of the property should be taken into consideration and allowed as a part of the damages to be estimated. It is true that the decision held that interest could not be allowed (no doubt because of former expressions of the court), but at the same time the legal rate of interest on the assessed value of the property was the amount allowed as a reasonable compensation or as damages. Strictly speaking, it is difficult to draw a distinction between the amount allowed and interest, which is nothing more than compensation for the use of the money of another or

for delay in paying a debt due another. Historically, it is of importance to the issue here to observe that the primary functions of the government in raising revenue and in acquiring property in eminent domain for public use would not involve the borrowing and lending of money from and to its citizens, but that, when and as soon as the government became a borrower from its citizens, it recognized the obligation to pay just compensation for the use of money and provided for the payment of interest therefor. Indeed, it must have been recognized that to attempt to do otherwise would have been in violation of the constitutional provisions above referred to.

During the World War and since, the activities of the government have been greatly extended. It has borrowed more money and has issued more bonds at a liberal rate of interest than ever before. It has also established a banking system, and is now conducting, under the Federal Reserve Act, a business that is essentially a banking business, where the receipt and charge of interest is as well recognized as in private transactions. Among other activities of the government, whether impelled by necessity or liberality, the government entered into the insurance business under the War Risk Insurance Act. In order that the commerce of the country might not be destroyed or too greatly curtailed, a system of marine insurance was provided for in this act. This included not only the insurance of vessels, their freight and passage moneys, cargoes, and personal effects of the masters, officers, and crews, but also the lives of those who were in charge of and operating these vessels, and for these it included payment, not only in case of death, but for permanent or partial disability. This act, originally passed in September, 1914 (38 Stat. 711), just after the outbreak of the World War, was amended from time to time, and, in contemplation and consideration of America's becoming involved in that war, it provided for insurance of all soldiers drafted or engaged in that war against death and permanent and total disability upon their payment of a stated premium. Other subdivisions of the act made provision for compensation to the soldiers and allowances to their families and also for pensions and bonuses. It will be observed that the act itself draws a clear line of distinction between war risk insurance policies upon the lives of these soldiers and the other and more paternal provisions last above referred to. In the one case, the soldier being exposed to extraordinary hazards of war, including death and total and permanent disability, was permitted at his option

to procure from the government insurance which he might not have been able to obtain from life insurance companies, either because of his physical condition or because of the extra hazards of his employment, and upon more favorable terms and at a more favorable rate than he could have obtained from old line companies, if obtainable at all. While it is true that this provision was of a liberal and paternal nature, the option of taking advantage of it was left entirely to the soldier. This insurance was founded upon contract, voluntarily to be assumed, and partaking of all the incidents of an ordinary insurance policy, including the requisite of the prompt payment of premiums, and the maturity of the obligation by death or permanent and total disability, just as in cases provided for by old line companies. And it is especially to be noted that the provision for these policies was contained in the same subdivision of the War Risk Insurance Act as that providing for marine insurance. The court has been advised of no case decided by the Supreme Court in which the question of interest upon a policy issued upon the life of an occupant of an insured vessel under the sections relating to marine insurance was determined or involved. In the case of Standard Oil Co. v. U. S., 267 U. S. 76, 45 S. Ct. 211, 69 L. Ed. 519, however, the Supreme Court passed upon the question of whether interest should be allowed upon a claim for loss of a vessel and its cargo under a policy issued under this act, and it was held that the government was so liable. In that case the court laid down the broad principle that, because the United States had gone into the insurance business, issued policies in familiar form, and provided that in case of disagreement it might be sued, it must be presumed to have accepted the ordinary incidents of suits in such business, and that interest at the legal rate should be allowed from the maturity of the claim, although interest was not specifically provided for in the War Risk Insurance Act. In the opinion of this court it is inconceivable that, without any discriminating words in the act, the courts would prefer property to human life and allow interest upon a policy for the loss of a vessel or its cargo and deny this right for the loss of a life involved in the same tragedy. In the decided case a great corporation subjected its property to the hazards of war, but with the assurance of reimbursement in case of its loss; in the other, the soldier or sailor risked his life under the same assurance from the government. It is further interesting to note that those engaged in business enterprises during the war period

were privileged to make and did make enormous profits, with no risk but that of their property, while the soldiers for small pay were serving their country at the risk of health and life, without the opportunity of sharing in business prosperity.

In connection with the provision for marine insurance, we find no provisions of the act relating to interest charges. The provisions for war risk insurance to soldiers recognize the reciprocal obligation to pay interest, both on the part of the government and on the part of the insured. Where a policy is made payable in installments, it is provided that the government shall calculate interest on the deferred payments at the rate of 3½ per cent., which may be deemed to be the amount which Congress thought a reasonable allowance; and, to procure a reinstatement of the policy where the premiums had lapsed, the soldier was required to pay 5 per cent. on past-due premiums. It is to be presumed that the government, in providing for this insurance, intended that there should be no discrimination as between the soldiers entitled thereto. In actual operation, however, it was inevitable that the overcrowded Bureau should make mistakes, and so it has happened that frequently soldiers, who were entitled years ago to the payment of their policies because of total and permanent disability, a fact established in each of the above-entitled cases by the verdicts of the juries, have been denied the payment of their policies for many years, while others received their pay promptly. It is true that, in many cases, these conditions arose because the soldiers themselves failed, from ignorance of the act or of their rights, to assert their claims with promptness. In a number of instances they applied for the insurance without ever seeing the act or of having any opportunity of becoming acquainted with it, and no policy, and in many instances not even a certificate, ever came into the hands of the soldier who had paid for his insurance. The first case which came under my observation was one in which an humble and ignorant negro applied for insurance as he was departing for France, paid the premiums as long as he was in the service, came home totally and permanently disabled, and died without being advised of his rights. He languished for months without receiving compensation for his disability or being aware of being entitled thereto. When the suit was brought, the question of interest was not involved, and I may say that generally it was not thought of by counsel who brought these cases until after the decision in the Standard Oil Case. It would be a narrow

and not the liberal construction required to be placed upon this act on behalf of the soldiers to disallow interest, and it would be a discrimination in favor of property and against manhood and against what I conceive to be the principles now recognized by the Supreme Court in cases where the government engages in the business of insurance. I find nothing in the case of White v. U. S., 270 U. S. 175, 46 S. Ct. 274, 70 L. Ed. 530, in conflict with these views. While the language of the learned justice, who wrote the opinion in that case, did state that the relation of the government to the soldiers, if not paternal, was at least avuncular, the opinion at the same time stated the essentials upon which interest is allowable, to wit, that the insurance was a contract for which a premium was paid, although not entered into by the United States for gain, and it must be observed that the issue in that case did not even remotely involve the right to claim interest.

In the late case of Boston Sand & Gravel Co. v. U. S., 278 U. S. 41, 49 S. Ct. 52, 54, 73 L. Ed. 170, suit was brought in admiralty for damages sustained by plaintiff by reason of a collision. The action sounded in tort and not in contract, and the majority of the court held that interest was not recoverable against the United States, although commonly included in collision cases where the government is not a party. The court followed the decision in the case of The Scotland, 118 U. S. 507, 6 S. Ct. 1174, 30 L. Ed. 153, which held that the allowance of interest on damages is not an absolute right even in admiralty cases. It also held that interest is no part of the damages sustained by reason of a collision for which suit might be brought under authority of the act. The court, however, said: "It [interest] might be in the case of detention of money," and that, "as the cause of action is the damage not the detention of the money to be paid for it, it could be argued in a respectable court, as late as 1886, that at common law, even as a matter of discretion, interest could not be allowed." In the discussion of the case, the court stressed the fact that interest was not allowable because the defendant was not bound to know the estimate that a jury would put upon the damage that it had caused, and it was clearly intimated that, if the amount for which suit was authorized had been fixed and certain and only the question of liability existed, interest would have attached from the due date. Four of the justices dissented, being of opinion that interest should have been allowed. While, therefore, the language of the majority opinion as to the allowance of interest for the detention of

money is obiter dictum, it clearly indicates that there was unanimity of opinion that interest would have been allowed if the claim had been for the detention of a fixed and certain sum of money and not for damages of an uncertain amount occasioned by tort. It must be remembered also that, while the right to sue is conferred by statute, the liability arose out of a tortious act and not from contract.

In line with the foregoing discussion, the conclusion reached by the court may be summed up as follows: That, although statutory authority may be given for suit, still on ordinary claims against the government no interest accrues because of the maturity of the debt, even though the claims arise under contract, unless interest be provided for by statute or by the terms of the contract itself. Where, however, under statutory authority, the government has entered into the business of insuring life or property for a monetary consideration and has issued insurance policies or contracted to do so in the method and substantially in the form adopted by business corporations, and has by such policies contracted to pay a sum certain upon the happening of a determined or determinable date, interest will accrue upon the amount so designated from the due date as in other business transactions founded on contract; such cases being governed by the commercial nature of the transaction rather than by the sovereign character of the obligor, whose sovereign immunity has been waived because of statutory authority to sue.

The next question is the rate of interest which should be allowed and the time from which it begins to accrue. In the solution of this question I carefully considered whether the naming of the rate of 3½ per cent. to be paid upon deferred installments should govern. This provision, however, relates only to deferred payments. The general rule is that, where the rate of interest is not specified in a contract, it is to be governed by the law of the locus of performance, as was held in the Standard Oil Case, supra. These policies were payable in South Carolina, and the legal rate of interest, where not fixed by contract, is 7 per cent. I think, therefore, that rate of interest should be paid upon the principal sum of each of the policies from the date of their maturity until the date of the judgment, except where payable in installments, in which event the 3½ per cent. rate provided by statute applies to each installment until the due date of its payment, after which the 7 per cent. rate shall be calculated as above

set out. As to the Wilkinson Case, the court is confronted with a somewhat embarrassing question because of the lack of evidence. The trial was conducted with the utmost fairness and liberality by counsel for both the plaintiff and the government. The policy itself was never offered in proof. Subsequently, however, one of the forms of policy prescribed by the Bureau was submitted to me, and it provides that the policy shall be payable upon proof of total and permanent disability. It is not shown that such proof was made or demanded. It was agreed, however, that the disagreement, entitling the court to jurisdiction, existed, and, since no question was made of the submission of proof, I am of opinion that the court must assume that the policy liability accrued on the date fixed by the jury, and that interest should be allowed from that date. In the other two cases, I find no evidence that forms of policy were ever prescribed by the Bureau, and, in the absence of such, the provision of the statute that the policy should be payable at death or at the date of total and permanent disability while the policy is in force establishes the date of maturity.

The defendant, therefore, is liable for interest as above outlined, and judgment should be entered accordingly.